UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Laurie T. Deprato, | : | Case No. 5:08CV2270 |
| | : | |
| Plaintiff | : | Judge Solomon Oliver, Jr. |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Defendant | : | |

It is unclear whether this action entails a denial of an application for disability insurance benefits (DIB), 42 U.S.C. §416(i), 423, only or such a claim and a claim for supplemental security income, 42 U.S.C. §1381 et seq.

Plaintiff's submission on the merits states that it is both.

Defendant's submission indicates that only a DIB claim is at issue, but acknowledges that there is documentation in the record pertaining to an SSI claim.

The Request for Hearing by An Administrative Law Judge contains a block to be completed by the Social Security Administration indicating the type of claim involved, but nothing was checked off.

The caption on the decision of the Administrative Law Judge (ALJ), whose decision represents the defendant's final determination, only references a DIB claim.

The problem is that although the transcript is certified as constituting "a full and accurate Transcript of the entire record of proceedings relating to this case" there is no application for

benefits, either DIB and/or SSI in the transcript. There is also no "Disability Report-Adult" form, which this Court is well aware is routinely completed by a claimant along with a benefits application, which calls for statements of the claimant's alleged disabling impairments and the manner in which those impairments limit the claimant's ability to work.

If the conclusion reached by this Court was different these deficiencies in the record cold be of consequence. However, by reason of that conclusion it becomes a matter of no consequence, other than noting that the defendant's failure to in fact file a full and accurate transcript has led to this state of uncertainty.

Nevertheless, this Court will accept the assumption of both parties that whatever claim or claims are at issue was/were filed on August 24, 2004 and alleged an onset date of June 1, 2002.

Upon denial of plaintiff's claim(s) de novo hearing before an ALJ was requested, and an evidentiary hearing pursuant thereto was held on September 5, 2007. Testifying at that proceeding were the plaintiff and a vocational expert, Mr. Mark Anderson.

When asked by her counsel "What do you think is the main thing that keeps you from working now?" the plaintiff testified:

> A. Probably the chronic pain and fatigue.
>
> Q. Okay, and where is the pain the worst?
>
> A. The pain varies every day.
>
> ALJ: In, in location or in intensity?
>
> CLMT: In location.
>
> ALJ: Okay.
>
> CLMT: And intensity as well. That's hard to answer. Say it's my neck and arms. Sometimes it can be my low back.

        My upper back.  It all varies.

BY ATTORNEY:

Q.      Does the pain get worse with certain weather conditions?

A.      Yes, it does.

Q.      Okay.  Is it worse in the cold?

A.      Yes.

Q.      Okay.  Do you have good days and bad days with the pain?

A.      Yes.

Q.      And, any given month, how many good days would you say you have in a month?

A.      I don't know.  I'll give you a, good days for me, maybe 15.  I don't know.

Q.      Okay.

A.      I'm not sure about that.

Q.      And what can you do on a good day that you can't do, like, on an average day?

A.      Laundry, cook, any normal, I guess, household duties.

Q.      And how many bad days would you say you have in a month?

A.      Probably about 15.

Q.      Okay, and what are those bad days like?

A.      Those bad days are days like, ask me to stay in bed and (INAUDIBLE).

Q.      And do you stay in bed all day on a bad day?

A.      No.

> Q. Okay. What, what portion of the day would you say you stay in bed on a bad day?
>
> A. Usually I lay down in the afternoon for three or four hours. I do a few things here and there. Sitting down, you know, taking frequent rests.
>
> Q. And do you still have the migraines?
>
> A. Yes.
>
> Q. How often do you have migraines?
>
> A. I usually get those at least a couple times a month.

She later testified:

> Q. Okay. And as far as things like household chores, you do those on good days?
>
> A. Yeah.
>
> Q. Okay. And how do you spend a typical day?
>
> A. Get up. It usually takes me, if I have to go somewhere, I usually have to get up an hour and a half before I got to go. To wake up, to get fully awake. I may do laundry, pick up stuff around the house, do errands. Do, if I have to get a few things at the store, I go by myself. If not, if I have to do a week's worth of groceries or more, I always take somebody, because carrying the groceries in and out are hand on my hand and shoulder.
>
> Q. What about hobbies, social activities, church services?
>
> A. Church, yeah occasionally. I read books. That's pretty much.
>
> Q. And what's the most you think you can lift and carry now with the right arm?
>
> A. The right arm? Without pain?

Q. Just the most that you can lift and carry period, before the pain is too much.

A. Before the pain is too much?

Q. Yes.

A. Maybe about, maybe five or 10 pounds.

Q. Okay. And what about with the left arm?

A. I also have a torn rotator cuff on the left side, and tennis elbow in that arm as well. Probably about the same.

Q. Okay. And how long can you sit for one period at a time?

A. Well, it's about time for me to stand up, so—

ALJ: And you're, and you're certainly welcome to do that. You don't even have to ask. Yeah, if you want to stand up, that's fine.

CLMT: So maybe, what, about 20 minutes.

BY ATTORNEY:

Q. Okay. And what about, how long can you stand and walk?

A. Walking's longer. I don't know, maybe about a half an hour.

Q. Okay. Okay. And is there any, any other problems, physical or mental, that we didn't talk about yet?

A. Anxiety disorder.

Q. Okay, and how does that affect you?

A. I have a mitro-prolapsed valve, and when I have an anxiety attack my heart beats real fast, and the pain is so intense in my heart that I got to stop breathing for a few minutes.

On December 28, 2007 the ALJ entered a decision finding the plaintiff not disabled. Plaintiff's counsel then submitted a post-hearing brief arguing that that decision should be recalled and a favorable ruling entered. In response the ALJ issued a reopened decision on February 4, 2008, again finding the plaintiff not disabled. That decision stands as the defendant's final determination consequent to denial of review by the Appeals Council on July 30, 2008.

The ALJ's "Findings of Fact and Conclusion of Law," set out in a comprehensive fifteen page opinion, were:

>    1. Ms. Deprato meets the insured status requirements of the Social Security Act through March 30, 2007.
>
>    2. Ms. Deprato has not engaged in substantial gainful activity since June 1, 2002, the alleged onset date (20 CFR 404.1520(b0 and 404.1571 *et seq*.).
>
>    3. Since the June 1, 2002 alleged onset date, Ms. Deprato has the following severe impairments: bipolar disorder (Exhibits 2F, 9F, 15F, 16F, 17F, 18F, 24F, 28F, 30F and 33F), fibromyalgia (Exhibits 11F and 13F), residuals of an L5-S1 fusion (Exhibits 1F, 2F, 4F, 11F, 13F, and 28F), residuals of surgical release of right cubital tunnel, right carpal tunnel, and right ulnar tunnel (Exhibit 7F), myofascial pain of the right shoulder (Exhibits 3F and 7F), and right epicondylitis (Exhibits 7F and 32F) (20 CFR 404.1520(c)).
>
>    4. Ms. Deprato does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
>    5. Ms. Deprato retains the residual functional capacity to perform a range of light work. Specifically, she can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently and can sit, stand and/or walk for 6 hours each in an 8-hour workday with normal breaks. She cannot work above shoulder level with the right upper extremity. She can occasionally perform rapid, repetitive hand and finger operations with the right upper extremity. She is limited to tasks that are simple, routine, and

>   low-stress and is precluded from tasks that involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

6.  Ms. Deprato is unable to perform any past relevant work (20 CFR 404.1565).

7.  Ms. Deprato was born on February 25, 1960 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  Ms. Deprato has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Deprato is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering Ms. Deprato's age, education, work experience, and residual functional capacity, there are jobs that exist insignificant numbers in the national economy that she can perform (20 CFR 404.1560(c) and 404.1566).

11. Ms. Deprato has not been under a disability, as defined in the Social Security Act, from June 1, 2002 through the date of this decision (20 CFR 404.1529(g)).

The standards which control on a review of this nature were summarized by the Sixth Circuit in Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984) as follows:

>   Judicial review of the Secretary's decision is limited in scope to determining whether the findings of fact made by the Secretary are supported by substantial evidence and deciding whether the Secretary employed the proper legal criteria in reaching her conclusion, Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967). This Court may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility, Myers v. Richardson, 471 F.2d 1265 (6th Cir. 1972). Rather "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive..."  42 U.S.C.  §405(g).

> The Supreme Court has stated that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality of the evidence must be based upon the record taken as a whole. Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980), citing Futernick v. Richardson, 484 F.2d 647 (6th Cir. 1973). "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the `substantiality of evidence must take into account whatever in the record fairly detracts from its weight'." Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978), quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474 (1951). "We may not focus and base our decision entirely on a single piece of evidence, and disregard other pertinent evidence." Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

In resolving the issue of whether the defendant's final determination is supported by substantial evidence the decision upon judicial review cannot turn upon whether the reviewing court agrees with the Secretary's determination. Indeed, the reviewing court may conclude that substantial evidence would support a final determination contrary to that arrived at by the defendant and yet be obliged to affirm the defendant's final determination. In Mullen v. Bowen, 800 F.2d 535, at 545 (6th Cir. 1986), the court cited with approval the following from Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984):

> The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision.

On this appeal the two issues raised by the plaintiff are:

1. Did the ALJ give appropriate weight to treating and consulting source opinions of disability?

2. Did the ALJ carry his burden at Step five when he found after obtaining Vocational Expert testimony that Deprato was capable of a limited range of light work?

This is one of those rare cases in which this Court has little to say other than it is clear that the ALJ's decision was within his zone of choice.

The little that this Court has to say in addition to this includes the fact that plaintiff's counsel misstates some of the record evidence in her submission on the merits. For example, in her brief she states that a state reviewing psychologist found that the plaintiff "would be unable to complete a normal work day and work week without interruptions from psychologically based symptoms," citing to pages 670-671 of the record for that proposition. In fact the psychologist found no such thing. Pages 670-671 are a Mental Residual Functional Capacity Assessment he completed, and of the twenty factors enumerated he found the plaintiff not significantly limited in eleven, moderately limited in nine, and concluded:

> Clmt would be able to handle simple and multi-step tasks of a routine nature, with reduced productivity demands due to her depression. The claimant's ADL's suggest that she can withstand the stress of a normal work week without decompensation.

(R. 672).

Much of plaintiff's arguments focus on a consultative psychological evaluation performed by Dr. Frederick Leidal in June 2004. This Court finds that the ALJ gave cogent reasons for discounting certain of Dr. Leidal's conclusions. This Court would also observe that Dr. Leidal did not find that the plaintiff suffers from a mental/emotional impairment preclusive of engaging in work activities. Instead, he was equivocal on the subject, and his opinion in part rested upon non-psychological factors which the ALJ did not find established by the evidence. In this regard his report states:

> Vocationally, Ms. Deprato is probably going to be a marginal candidate for vocational rehabilitation, due in part to her limited

9

> education and academic skills, but also because of her limited interests and limitations imposed by her physical abilities. Ms. Deprato's interests would appear to require considerable stamina and be quite a "stretch" for her, considering her lack of energy for this appointment (which occurred after 9 am) and her reported inability to function in the afternoon, which would preclude after school programs. Her depressive symptoms and problems with pain management appear to also limit her ability to function, either because of the sedating effects of medications, or because of the physical or psychological manifestations of these conditions (i.e., inability to maintain a focused attention, irritability, anxiousness, etc.). It is highly questionable whether or not she could tolerate even part-time work and what this would be because of her limited skills and physical abilities. She should probably consider deferring any decision to pursue training for another job until her depression and pain are better managed and she has a more realistic idea of both what she wants to do and what she is physically able to do.
>
> Barriers to employment, education, or vocational planning at this time are predominately related to her physical conditions, the limitations which they impose, her limited intellectual and academic abilities, and lack of vocational direction and insight.

This Court must also note that when the plaintiff was enrolled in the Pain Management Program at the Cleveland Clinic in 2002 her treating physician refused to sign a Worker's Compensation form for temporary total disability, his note reading "I declined to complete it, as I'd previously advised that she return to work"[1] and that upon completing a program of physical therapy in 2002 she was released to return to work.

In addition patient notes of plaintiff's treating psychiatrist in 2007 refer to her as "doing better" (5/15/06); "doing well" (10/2/06); "doing OK" (1/16/07); and; "mentally OK, has financial problems" (5/18/07).

Finally, a vocational evaluation performed at Edwin Shaw Rehab unit of the Akron General

---

[1] In another note the doctor suggested that the plaintiff's prognosis was "statistically reduced by pending personal injury litigation."

10

Hospital in May 2007 reflects that, with some limitations, the plaintiff is capable of working (R. 45-64).

It is recommended that final judgment be entered in defendant's favor.


                                                                s/DAVID S. PERELMAN
                                                                United States Magistrate Judge


DATE:    September 23, 2009


## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).